UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ALIHEA JONES,<br><br>Defendant | Criminal No.  24cr10194<br><br>Violations:<br><br>Counts One - Five: Wire Fraud<br>(18 U.S.C. § 1343)<br><br>Forfeiture Allegation:<br>(18 U.S.C. § 981(a)(1)(C) and<br>28 U.S.C. § 2461(c)) |

INFORMATION

At all times relevant to this Information:

General Allegations

1. Defendant ALIHEA JONES was a resident of Georgia.

2. The Massachusetts Department of Housing and Community Development ("DHCD") was a department within the Massachusetts Executive Office of Housing and Economic Development.[1] DHCD administered a program called Residential Aid to Families in Transition ("RAFT"). Through RAFT, the Commonwealth of Massachusetts paid emergency funds to low-income residents facing eviction, foreclosure, loss of utilities, and other housing emergencies.

3. DHCD contracted with a company specializing in affordable-housing administration (the "Housing Company") to help administer the RAFT program. From on or about March 9, 2022, through on or about September 23, 2022, JONES was employed as a

---

[1] In 2023, the Massachusetts Legislature passed a law creating a new Executive Office of Housing and Livable Communities, which assumed all of the powers and responsibilities of the DHCD.

1

contract worker with the Housing Company, processing RAFT applications remotely. JONES had access to bank account information in RAFT participants' files.

### *The Paycheck Protection Program*

4. JONES was the sole owner of a business called Beauty Concepts by Alihea, LLC ("Beauty Concepts"). JONES had formed Beauty Concepts in 2018 under Georgia law.

5. The United States Small Business Administration ("SBA") was an agency of the executive branch of the United States government. The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters. As part of this effort, the SBA enabled and provided for loans, guaranteed by the government, through banks, credit unions, and other lenders.

6. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in March 2020 to provide emergency financial assistance to Americans suffering the economic effects of the COVID-19 pandemic. The CARES Act also provided funding for forgivable loans to small businesses for job retention and certain other expenses through the Paycheck Protection Program ("PPP"). The PPP offered forgivable loans to small businesses affected by the COVID-19 pandemic. The loan proceeds could be used for payroll and certain other business expenses.

7. In order to obtain a PPP loan, a qualifying business was required to submit a loan application signed by an authorized representative of the business acknowledging the program rules and making certain affirmative certifications, including certifications about the number of its employees and the business's average monthly payroll expense. PPP loan applications were processed by participating lenders.

8.       Because the PPP was an emergency program designed to provide funds to small businesses as quickly as possible, participating lenders were allowed to rely on applicants' certifications without verifying the accuracy of information the applicants represented to be true.

9.       If a PPP loan application was approved, the participating lender funded the PPP loan using its own money, but the loan was guaranteed by the SBA. Data from the application, including information about the borrower, the total amount of the loan, the listed number of employees, and the business's average monthly payroll expense, was transmitted by the lender to the SBA in the course of processing the loan.

10.      After obtaining the loan proceeds, the borrower could apply for forgiveness of the loan if they met certain requirements. If the loan was forgiven, the SBA repaid the lender the full amount of the loan plus any accrued interest.

11.      A private financial services company referred to herein as the "Lender," which was based in Massachusetts, participated in the PPP program as a lender.

### *The RAFT Program*

12.      The DHCD contracted with eleven regional administrative agencies across Massachusetts (the "RAAs") to process RAFT applications, collect supporting documents from applicants and creditors, approve or deny applications, and distribute awarded funds.

13.      The Housing Company processed overflow RAFT applications, essentially serving as a twelfth RAA. Housing Company employees worked on the RAFT program remotely. Each employee had a unique username and password required to access the platform used for the RAFT program.

14.      RAFT funds were paid directly to applicants' creditors, primarily landlords. Although some payments were by check, most were electronic money transfers. Payment

information, including routing and account numbers of creditors' bank accounts, was stored in the RAFT database.

15. RAFT payments authorized by the Housing Company were emailed to the Metropolitan Boston Housing Partnership ("Metro Housing Boston") in weekly reports. Each report listed hundreds of authorized payments to RAFT creditors. Metro Housing Boston processed each weekly report in a single batch payment. This caused the funds for each individual payment to be debited from Metro Housing Boston's account at Bank of America in Massachusetts and transmitted to the recipient by electronic transfer or check.

JONES's Scheme to Defraud the SBA

16. On or about February 24, 2021, JONES submitted a PPP loan application to the Lender on behalf of Beauty Concepts. JONES identified Beauty Concepts as a beauty salon.

17. JONES represented on her application that Beauty Concepts had 17 employees and an average monthly payroll of $74,800. These representations were false. JONES was the only person who performed any work under the name Beauty Concepts. In addition, JONES did not report any income or loss for Beauty Concepts on her federal tax returns for 2018, 2019, or 2020. Nor did Beauty Concepts pay any payroll taxes, or issue any Forms W-2 or 1099.

18. JONES supported her application with a falsified payroll report.

19. The form PPP loan application completed by JONES stated that the amount of the loan request was automatically 2.5 times the business's monthly payroll. Because JONES represented that Beauty Concepts' monthly payroll was $74,800, the amount of her loan request was automatically 2.5 times that amount, or $187,000.

20. The application signed by JONES included numerous certifications, including that "the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects."

21. The Lender asked the SBA to guarantee the loan if Beauty Concepts later applied for, and was granted, loan forgiveness. In support of its request, the Lender provided the SBA with information stated on JONES's application, including that Beauty Concepts had 17 employees and average monthly payroll of $74,800, as well as JONES's certifications.

22. The SBA agreed to guarantee the loan to Beauty Concepts. JONES's certifications and other information relayed to the SBA by the Lender, including JONES's false representations about the number of Beauty Concepts' employees and its payroll expenses, were material to the SBA's decision.

23. On or about March 2, 2021, the Lender electronically transferred $187,000 from its account at Santander Bank in Massachusetts to Beauty Concepts' account no. -6659 at JPMorgan Chase in Georgia (the "Beauty Concepts account").

24. JONES spent the loan proceeds in just four months. By June 30, 2021, only approximately $641 remained in the Beauty Concepts account.

25. JONES spent almost all of the loan money on personal, non-business expenses, including rent, clothing, restaurants, travel, and repayment of personal loans.

26. JONES falsely described her use of more than $50,000 of the loan proceeds as "payroll" to try to conceal her true use of the money. She did so as follows:

   a. Between on or about March 8, 2021, and on or about May 20, 2021, JONES made twelve transfers of $4,400 each from the Beauty Concepts account to JONES's personal account no. -2592 at Suncoast Credit Union. JONES described each transfer as "bcaj Payroll," even though the money had nothing to do with Beauty Concepts' payroll.

   b. On or about March 15 and 16, 2021, JONES made two transfers of $5,000 each from the Beauty Concepts account to a friend's account at Atlantic

5

Federal Credit Union, no. -1371. JONES labeled each transfer "Nael Payroll," even though the money was partial repayment of a personal loan and had nothing to do with Beauty Concepts' payroll.

27. On or about February 15, 2022, JONES submitted a loan forgiveness application to the Lender on behalf of Beauty Concepts. On the application, JONES --

   a. Falsely represented that Beauty Concepts had 17 employees;

   b. Falsely represented that Beauty Concepts had incurred payroll costs of $168,000 between March 2 and April 27, 2021;

   c. Falsely certified that she had "accurately verified the payments for the eligible payroll and nonpayroll costs" for which she was seeking loan forgiveness; and

   d. Falsely certified that "[t]he information provided in this application and all supporting documents and forms is true and correct in all material respects."

28. JONES supported her forgiveness application with a fabricated payroll report.

29. On or about February 24, 2022, the Lender reported the information on Beauty Concepts' forgiveness application and supporting payroll report, as well as JONES's certifications, to the SBA.

30. On or about February 28, 2022, the SBA granted Beauty Concepts' forgiveness application. JONES's certifications and other information relayed to the SBA by the Lender were material to the SBA's decision.

31. On or about February 28, 2022, the SBA repaid the Lender the full $187,000 principal amount of Beauty Concepts' loan plus $1,849.22 in accrued interest.

### JONES's Scheme to Defraud the Massachusetts Department of Housing and Community Development

32.     On or about March 9, 2022, JONES was hired through a Boston-based temp agency to work for the Housing Company, processing RAFT applications for DHCD. JONES worked remotely.

33.     JONES was given a unique username and password to access the platform used to process RAFT applications (the "RAFT platform").

34.     On or about Friday, September 23, 2022, the Housing Company terminated JONES for poor performance. JONES did not log out of the RAFT platform.

35.     On or about Monday, September 26, 2022, JONES used the RAFT platform to access the RAFT file of "Applicant 1," and requested a $7,500 electronic payment to Applicant 1's landlord. However, JONES changed the routing and account numbers of the landlord's bank account to the numbers for the Beauty Concepts account. JONES did so without the knowledge or permission of DHCD or the Housing Company.

36.     On or about Friday, September 30, 2022, the Housing Company emailed Metro Housing Boston a weekly report listing hundreds of authorized payments to RAFT creditors, including the $7,500 payment inputted by JONES.

37.     On or about Friday, September 30, 2022, Metro Housing Boston processed the weekly report in a single batch payment. Neither DHCD, the Housing Company, nor Metro Housing Boston was aware that the weekly report included JONES's fraudulent request for a $7,500 payment to Beauty Concepts' account.

38.     On or about Monday, October 3, 2022, the fraudulently requested $7,500 payment transfer was received in the Beauty Concepts account.

39. On or about Monday, October 3, 2022, JONES, who was still logged into the RAFT platform, inputted requests for three additional fraudulent transfers:

   a. JONES accessed the RAFT file of "Applicant 2" and requested an $8,800 electronic payment to Applicant 2's landlord. However, JONES changed the routing and account numbers of the landlord's bank account to the numbers for JONES's account at Navy Federal Credit Union ("NFCU") in Georgia, no. -2981.

   b. JONES accessed the RAFT file of "Applicant 3" and requested a $6,925 electronic payment to Applicant 3's landlord. However, JONES changed the routing and account numbers of the landlord's bank account to the numbers for account no. -3081 at NFCU in Georgia. This account belonged to a friend of JONES referred to herein as "Friend A."

   c. JONES accessed the RAFT file of "Applicant 4" and requested a $10,000 electronic payment to Applicant 4's landlord. However, JONES changed the routing and account numbers of the landlord's bank account to the numbers for account no. -7870 at NFCU in Georgia. This account belonged to a friend of JONES referred to herein as "Friend B."

40. JONES requested the above three payments without knowledge or permission of DHCD or the Housing Company.

41. After requesting the above three fraudulent payments, JONES logged out of the RAFT platform.

42. On or about Friday, October 7, 2022:

   a. The Housing Company emailed Metro Housing Boston a weekly report listing hundreds of authorized payments to RAFT creditors, including the three inputted by JONES on October 3, 2022.

   b. Metro Housing Boston processed the weekly report in a single batch payment. Neither DHCD, the Housing Company, nor Metro Housing Boston was aware that the weekly report included JONES's three fraudulent requests for payment.

   c. The fraudulently requested $8,800 payment was received in JONES's account at NFCU, no. -2981.

   d. The fraudulently requested $6,925 payment was received in Friend A's account at NFCU, no. -3081.

   e. The fraudulently requested $10,000 payment was received in Friend B's account at NFCU, no. -7870.

   f. JONES tried to log back into the RAFT program. She was unable to do so, however, because her access had been terminated.

43. On or about October 11, 2022, JONES deposited in the Beauty Concepts account two $1,000 money orders received by Friend A as a kickback for the unauthorized RAFT payment to Friend A.

44. On or about November 8, 2022, JONES's NFCU account no. -2981 received an electronic transfer of $2,000 from Friend B's NFCU account no. -7870 as a kickback for the unauthorized RAFT payment to Friend B.

COUNTS ONE-FIVE
Wire Fraud
(18 U.S.C. § 1343)

The United States Attorney charges:

45. The United States Attorney re-alleges and incorporates by reference paragraphs 1-44 of this Information.

46. On or about the dates below, in the District of Massachusetts and elsewhere, the defendant,

ALIHEA JONES,

having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing the scheme to defraud, as set forth below:

| Count | Date | Description |
|---|---|---|
| 1 | 3/2/2021 | $187,000 electronic transfer from Lender's account at Santander Bank in Massachusetts to Beauty Concepts by Alihea LLC's account no. -6659 at JPMorgan Chase Bank in Georgia |
| 2 | 10/3/2022 | $7,500 electronic transfer from Metro Housing Boston's account at Bank of America in Massachusetts to Beauty Concepts by Alihea LLC's account no. -6659 at JPMorgan Chase Bank in Georgia |
| 3 | 10/7/2022 | $8,800 electronic transfer from Metro Housing Boston's account at Bank of America in Massachusetts to ALIHEA JONES's account no. -2981 at Navy Federal Credit Union in Georgia |
| 4 | 10/7/2022 | $6,925 electronic transfer from Metro Housing Boston's account at Bank of America in Massachusetts to Friend A's account no. -3081 at Navy Federal Credit Union in Georgia |
| 5 | 10/7/2022 | $10,000 electronic transfer from Metro Housing Boston's account at Bank of America in Massachusetts to Friend B's account no. -7870 at Navy Federal Credit Union in Georgia |

All in violation of Title 18, United State Code, Section 1343.

FORFEITURE ALLEGATION
(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

The United States Attorney further finds:

1. Upon conviction of one or more of the offenses in violation of Title 18, United States Code, Section 1343, set forth in Counts One through Five, the defendant,

ALIHEA JONES,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses. The property to be forfeited includes, but is not limited to, the following asset:

   a. $222,074, to be entered in the form of a forfeiture money judgment.

2. If any of the property described in Paragraph 1, above, as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), as a result of any act or omission of the defendant --

   a. cannot be located upon the exercise of due diligence;

   b. has been transferred or sold to, or deposited with, a third party;

   c. has been placed beyond the jurisdiction of the Court;

   d. has been substantially diminished in value; or

   e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 1 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

                                                JOSHUA S. LEVY
                                                ACTING UNITED STATES ATTORNEY

By: _____
     CHRISTINE WICHERS
     Assistant U.S. Attorney

Date: July 3, 2024